# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| RAVEN RAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No.: 2:08-CV-3512-PMD |
| v. ) | |
| ) | |
| ROBIN L. BOWERS, in his individual ) | **ORDER** |
| Capacity, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the court upon Defendant Robin Bowers's ("Bowers") Motion for Summary Judgment as to Plaintiff Raven Ray's ("Ray") claims against him arising from the alleged sexual harassment of Ray by Bowers. Ray's claims against Bowers include a civil rights violation pursuant to 42 U.S.C. § 1983 and state law claims of battery, harassment, stalking, intentional infliction of emotional distress, and assault. Bowers has asserted a counterclaim against Ray for defamation. A hearing was held on December 3, 2009. For the reasons set forth below, the court grants Bowers's Motion for Summary Judgment as to Ray's claims against him, but dismisses Bowers's defamation counterclaim without prejudice in order to proceed in state court.

## BACKGROUND

Ray graduated from the College of Charleston ("the College") in May of 2007 with a Bachelor of Science in Psychology. During the fall 2006 semester of her senior year, Ray enrolled in Advanced General Psychology, PSYC 396, which was taught by Defendant Bowers. *Am. Compl.* at ¶ 15. Ray was twenty-one years old at the time. Ray had not taken any of Bowers's other classes nor had she ever met him prior to taking that class, and Ray stated that,

prior to that class, she had no knowledge or opinion of Bowers. *Pl. Dep.* at 337. In October of 2006, Ray invited Bowers to attend a Halloween party at her apartment in an email discussing details of an upcoming presentation for class. *Id.* at 51. Bowers accepted Ray's invitation. Ray testified that her party began somewhere around 9:00 or 10:00 pm on the evening of Saturday, October 28, 2006 and that around 20 people attended. *Id.* at 68. Ray does not know what time Bowers arrived, but she recalls that she "welcomed him to the party," and that they both "kind of mingled with other people. Ray testified that she did not spend a lot of time with Bowers during the party. *Id.* at 71. However, Ray recalls that Bowers left the party twice during the evening. The first time Ray noticed Bowers was missing, Ray called him and asked him where he went. *Id.* at 69. He told her that "he just went to the gas station, he will be right back." *Id.* Bowers did return, but when Ray noticed that he had left a second time sometime around midnight and without saying goodbye before he left, Ray called Bowers again and asked him "where did you go this time?" *Id.* at 70. Ray's telephone records show that Ray called Bowers twice during the time period that Bowers left the party the first time and that she called him three times after Bowers left the second time. In addition, Ray sent Bowers seventeen text messages on the day of her Halloween party.

After the October 28th Halloween party, Ray and Bowers exchanged multiple text messages. Ray kept a record of seventeen text messages she received from Bowers from October 29 through October 31; however, during that same time period, her phone records show that she sent him eighty-four text messages. Ray testified that the text messages were mutual and consensual during this time frame. *Id.* at 119.

Ray states that the next time she saw Bowers in a social setting was on October 31, 2006. *Id.* at 72. Ray claims that she cannot recall who initiated the second meeting, but that Ray and

Bowers arranged to meet at the Vickery's Halloween costume party. After the Vickery's party, Ray, Bowers, and some of Ray's friends went to a party at the Kickin' Chicken. *Id.* at 73. Ray testified that the party at Kickin' Chicken was fun, but that at some point she noticed that "Bowers disappeared again." *Id.* at 75. Ray claims that she checked and found that he was not in the bathroom, so she called him and asked "where did you go?" *Id.* According to Ray, she understood from the phone conversation that Bowers was angry with her. *Id.* Ray testified that during the phone conversation, Bowers said "come to me," and Ray decided to drive to his home. *Id.* According to Ray, she "had to beg [Ray's friend] Alex to let me have my car keys," and she told Alex that she was going to see Bowers because he was angry. *Id.* at 76. Ray claims that she drove to Bowers home and that once she arrived at his home, "strangely everything was okay. All of a sudden, he was no longer angry." *Id.* at 78. Ray decided to stay at Bowers's home, toured the home, had sex with Bowers, spent the night with him, and "woke up in his bed the next morning." *Id.* at 79. That morning, Bowers and Ray, driving separately, went to the Blue Rose café for breakfast. *Id.* at 82. After breakfast, Ray went home to change clothes and went straight from her home to her first class of the day, which happened to be Bowers's class. *Id.* at 86.

Ray continued the sexual relationship with Bowers throughout the Fall 2006 semester. Ray claims that she felt powerless to end the sexual relationship and harassing text messages by Bowers because of fear that he would sabotage her grade or otherwise retaliate against her. However, Ray admits that throughout the relationship she never suggested to Bowers that the relationship was unwelcome in any way. In fact, Ray testified that throughout the semester, Ray "pretended like everything was fine, even with my family." *Id.* at 129. Ray stated that she "tried to make [Bowers] think that, you know, I liked him" and that she "just wanted to make him

calm, you know, until the end of the semester so I could get my grade." *Id.* at 181. Ray agreed that it would be "a fair characterization to say [she was] pretending it was welcome as far as [Bowers] was concerned." *Id.* at 345. In addition to having a sexual relationship with Bowers, Ray went to the movies with him, went out for dinner or drinks with him, and gave him a book on "Sextrology" for his birthday in early November. *Id.* at 181, 250.

Ray claims that she continued the relationship with Bowers because she feared that he would sabotage her grade or otherwise retaliate against her. However, Ray admits that Bowers never gave any indication that her grade was dependent on her continuing his relationship with her. *Id.* at 185. Additionally, Ray continued to text message and call Bowers even after Bowers had posted Ray's grade. On December 14, 2006, Bowers posted grades for Ray's psychology class, and Ray received an "A" for the course. On December 15, 2006, Ray sent eleven text messages to Bowers. On the 16th, she sent him seven text messages. Ray sent him three text messages on December 17, followed by another four messages on December 18. On December 23, Ray sent Bowers thirty one text messages in an eight-hour period. Although Ray did not save any text messages from Bowers from December 23, she claims he was texting her back and they were having a fight. In total, Ray sent over 130 text messages to Bowers from the time her grade was posted on December 14, 2006 until January 31, 2007. In addition to the text messages, Ray made voice calls to Bowers as well. In fact, her phone records show that she called him every single day beginning on December 15, 2006, and continuing through December 23, 2006.

From October 27, 2006 through January 31, 2007, Ray selectively saved only 102 text messages sent from Bowers to Ray despite the fact that Ray claims she received thousands of text messages from him. All other messages from Bowers were deleted by Ray without being

4

forwarded, copied, transcribed, or otherwise preserved. Ray also cannot find the telephone on which the 102 transcribed messages from Bowers were saved. Because of a quirk in the manner in which text messages are recorded on billing, there is no way to identify the sender of a particular text message received by a phone unless the sender happens to have the same service provider as the recipient. Bowers and Ray did not have the same provider, and there has been no evidence produced in this case which definitively shows that Ray ever received more than the 102 transcribed messages from Bowers's number. However, Ray's cell phone records show that she sent Bowers approximately 950 text messages from October 27, 2006 through January 31, 2007 of which she save the content of only one of those messages.

Ray claims that Bower's harassment consisted of three types of conduct: (1) an unwanted sexual relationship between Bowers and Ray; (2) harassing conduct in the classroom environment; and (3) harassing messages and postings via text messages and internet postings. *Pl. Opp'n Mem.* at 9. Besides Ray's claim that she and Bowers had a sexual relationship, Ray claims that Bowers created a hostile environment for her as a student in his class by staring at her in class and by ignoring Ray in class on one occasion where Ray was the only one with her hand raised and Bowers refused to call on her, which according to Ray was because she had not returned Bowers text message the night before that class. *Pl. Dep.* at 134-36. Ray also claims that Bowers embarrassed her in class for not answering a text when Bowers pointed to a button on his shirt in class and asked Ray what it was. According to Ray, she said the word button, and when asked to repeat it louder, she did so, and that she "just knew that everybody in the class was probably looking at me like, why does he—how does he know I say button so well." Ray believes Bowers did this in retaliation for her not responding to a prior picture he sent her of elevator and shirt buttons. *Pl. Sworn Stmt.*, January 19, 2007, at 15. Ray also claims that

5

Bowers posted a song "Warmed X Warm" on a public website with the dedication "for Raven." Ray claims that the song references her sexual relationship with Bowers and that its posting constitutes sexual harassment. However, Ray testified that although she had the opportunity to object to its posting, she did not. *Id.* at 208.

On January 10, 2007, Ray reported to the College that Bowers had been sexual harassing her. Ray admits that this was the first time she reported any problem to the College and the first time she gave the College an opportunity to help her. *Id.* at 237-42. Ray stated that she was concerned that if she told the College what was happening during the semester, the College might remove her from the class and she would have to take a "W" (withdraw/no grade). *Id.* at 242. Ray stated that she "had to make sure I got my grade so I could graduate on time." *Id.* Ray continued to see Bowers even after she complained to the College of sexual harassment. She alleges that she did this to get evidence to help the College. However, she did not disclose to the College that she was continuing to see Bowers, she saved only a few of the text messages she says he sent her during that post-complaint time period, and she saved none of the text messages that her phone records show she sent him during that post-complaint time period. Ultimately, the College discharged Bowers as a result of Ray's complaint. Ray also graduated on time with a GPA of 3.74 for Spring semester 2007, her highest for any full semester in four years, and she made the Dean's list.

On October 16, 2008, Ray filed this suit against Bowers and the College. Ray's claims against Bowers include a civil rights claim under § 1983 and state law claims of battery, harassment, stalking, intentional infliction of emotional distress, and assault. Ray asserts a Title IX claim against the College. Bowers has asserted a counterclaim against Ray for defamation. On October 9, 2009, the College filed a motion for summary judgment, which was granted by

the court on November 23, 2009. On August 5, 2009, Bowers filed a motion for summary judgment on all of Ray's claims and on Bowers's Counterclaim for defamation.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327. Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented. *Anderson,* 477 U.S. at 248.

## ANALYSIS

In his memorandum in support of his motion for summary judgment, Bowers argues that the absence of any evidence of unwelcomeness bars Ray's claim for harassment in violation of Section 1983. Bowers also argues that Ray's apparent consent also bars her state law tort claims of assault, battery, and intentional infliction of emotional distress. Finally, Bowers notes that Ray's state law claims for harassment and stalking are brought pursuant to South Carolina Code Section 16-3-1700, a criminal statute that does not provide a private civil remedy.

In her memorandum in opposition to summary judgment, Ray argues that whether Ray welcomed the conduct and whether Ray displayed apparent consent to the conduct is a question of fact for the jury. Ray also argues that any consent by a student in their professor's class is suspect.

As to Ray's Section 1983 claim, Ray alleges that Bowers acted under color of state law to deprive her of her Fourteenth Amendment equal protection right to be free from sexual harassment in an educational setting. To survive Bowers's motion for summary judgment on her § 1983 sexual harassment claim, Ray must show that Bowers was a state actor, he harassed her because of sex, and the harassment was sufficiently severe or pervasive to interfere unreasonably with her educational activities. *Jennings v. University of North Carolina*, 482 F.3d 686, 701 (4th Cir. 2007). Section 1983 sexual harassment claims "are governed by traditional Title VII . . . jurisprudence." *Id.* The Supreme Court has made it clear that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986); *see also E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 314 (4th Cir. 2008). The issue of whether Bowers's sexual advances were "unwelcome" for purposes of Title VII cannot be determined by reference to Ray's subjective state of mind. Instead, "[t]he correct inquiry is whether [Plaintiff] *by her conduct* indicated that the alleged sexual advances were unwelcome." *Meritor,* 477 U.S. at 68 (emphasis added).

Normally, "the question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Id.* However, in the present case, the court finds that no reasonable jury could return a verdict for Ray on the evidence presented. As listed in the background section above, Ray initiated the relationship, sent Bowers over 950 text messages over the course of the relationship,

8

deleted all but one of the text messages that she sent to Bowers, and continued to call and text Bowers after Bowers had posted her grade and even after Ray had reported Bowers to the College. Additionally, Ray knew that she could report Bowers to the College but stated that she did not want to receive a "W" (withdraw/no grade) for the course and risk not graduating on time. *Id.* at 242. Ray also admits that Bowers never gave any indication that her grade was dependent on her continuing the relationship with him. *Id.* at 185. However, more importantly, Ray herself admits that, in all respects, she represented to Bowers and to the entire world including family, friends, and coworkers that the conduct at issue was, in fact, welcome. Ray agreed that it would be "a fair characterization to say [she was] pretending it was welcome as far as [Bowers] was concerned." *Id.* at 345. Additionally, Ray testified that throughout the semester, she "pretended like everything was fine, even with my family." *Id.* at 129. Therefore, the court finds that no reasonable jury could find that Ray "*by her conduct* indicated that the alleged sexual advances were unwelcome." *Meritor,* 477 U.S. at 68.

Ray has also asserted state law claims of assault, battery, and intentional infliction of emotional distress based upon Bowers's alleged sexual harassment of her. As with Ray's § 1983 claim, Ray's claims for assault, battery, and intentional infliction of emotional distress are barred by Ray's consent to Bowers's conduct. "No one can enforce a right arising out of a transaction which he has voluntarily assented to. It applies to intentional acts which would otherwise be tortuous." *Powell v. Drake,* 18 S.E.2d 745 (S.C. 1942). As discussed above, Ray admits that by her conduct she indicated to Bowers that his advances were welcome. Additionally, there is no evidence that her consent was a product of duress as Ray admits that Bowers never gave her any indication that her grade in his class was dependent upon her continuing a sexual relationship with him, and Ray never alleges that Bowers used any physical force during their relationship.

9

As such, Ray cannot prevail on her claims for assault, battery, and intentional infliction of emotional distress.

Ray also asserts claims of stalking and harassment pursuant to South Carolina Code § 16-3-1700. However, South Carolina Code § 16-3-1700 is a criminal statute that does not provide a private civil remedy. Therefore, the court dismisses these claims.

Finally, because the court has dismissed all claims over which it has original jurisdiction, the court declines to exercise supplemental jurisdiction over Bowers's state law defamation claim. A court has discretion to dismiss or keep a case when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Although without Ray's § 1983 claim the parties have established diversity of citizenship, Bowers's has not alleged an amount in controversy in excess of seventy-five thousand dollars. 28 U.S.C. § 1332. Therefore, as the court does not have original jurisdiction over Bowers's defamation claim and because the court declines to exercise supplemental jurisdiction over this claim after the claims over which it had original jurisdiction have been dismissed, the court dismisses Bowers's defamation claim without prejudice to proceed in state court.

## CONCLUSION

Based on the foregoing, the court **ORDERS** that Defendant Robin L. Bowers's Motion for Summary Judgment as to Plaintiff Raven Ray's claims against him is **GRANTED** and that Bowers's counterclaim for defamation is **DISMISSED** without prejudice in order to proceed in state court.

_____
PATRICK MICHAEL DUFFY
United States District Judge

**December 17, 2009**
**Charleston, SC**